UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Sevenson Environmental Services, Inc.

                Plaintiff,

                                                        **Hon. Hugh B. Scott**
                v.                                            02CV527

                                                        **Report**
                                                           **&**
Shaw Environmental, Inc.,                      **Recommendation**

                Defendant.

Before the Court are the defendant's motions to dismiss (Docket Nos. 89 & 95). Also pending is the defendant's motion to dismiss the complaint based upon alleged discovery abuses. (Docket No. 123)

### Background

The plaintiff, Sevenson Environmental Services, Inc. ("Sevenson") holds various patents relating to methods of treating hazardous materials. Sevenson claims that Shaw Environmental, Inc. ("Shaw") infringed its patents in connection with work it is performing at a lead-contaminated site in Colonie, New York ("Colonie").

The Colonie site is an approximately eleven acre area owned by the United States near Albany, New York. The United States Army Corps of Engineers ("USACE") manages the site. USACE was directed to oversee the cleanup and remediation of the site. USACE solicited proposals for remediation and eventually awarded the contract to ICF Kaiser ("ICF"). ICF

1

subcontracted with Kiber Environmental Services, Inc. ("Kiber") to have a treatability study performed.  It appears to be undisputed that according to the treatability study, phosphoric acid was found to be the most effective additive to stabilize the contaminated area.  The use of phosphoric acid was incorporated into the "Work Plan" specifying the process to be used to treat the soil at the Colonie site.

In early 1999, the remediation contract was acquired by IT Group, Inc. and IT Corporation (referred to collectively herein as "IT") from ICF.   IT was engaged to perform the remediation.  Sevenson originally brought patent infringement claims against IT based upon its work at Colonie.  That litigation was terminated when IT subsequently filed for bankruptcy on January 16, 2002.  During the course of the bankruptcy proceedings, IT entered into an agreement with Shaw in which Shaw obtained the remediation contract for the Colonie site.  Sevenson commenced the instant action alleging that Shaw continued IT's practice of infringement at the Colonie site.

Sevenson asserts that in its work at the Colonie site, Shaw has infringed Sevenson's patents relating to methods of treating hazardous materials. In the instant motion, Shaw maintains that because its contract with the government for the remedial work at the Colonie site contains an "Authorization and Consent Clause" ["A&C clause"] allowing Shaw to employ any patented method necessary to comply with the terms of the contract, Shaw is protected from liability on any infringement action by 28 U.S.C. §1498.  Generally, that statute protects government contractors from liability due to patent infringement claims where the infringement

was pursuant to the authorization and consent of the government entity.[1]  If §1498 is applicable in this case as the defendants contend, the plaintiff may not recover from Shaw but instead must initiate an action against the United States in the U.S. Court of Federal Claims.

Two contracts governed Shaw's work at Colonie.  The original contract, was entitled "Total Environmental Restoration Contract" or "TERC."  At some point, because of funding issues, the TERC was replaced by the "Pre-Placed Remedial Action Contract or "PRAC."  Both contracts contained the following A&C clause, in pertinent part:

> The government authorizes and consents to all use and manufacture, in performing this contract or any subcontract at any tier, of any invention described in and covered by a United States patent (1) embodied in the structure or composition of any article the delivery of which is accepted by the Government under this contract or (2) used in machinery, tools, ***or methods whose use is necessarily results from compliance by the Contractor or subcontractor with (i) specifications or written provisions forming a part of this contract or (ii) specific written instructions given by the Contracting Officer directing the manner of performance.***

(Docket No. 93,  Exhibits A and B)

Shaw maintains that this language is sufficient to trigger §1498 protection from Sevenson's claims. Sevenson maintains that the A&C clauses at issue in this case do not satisfy the requirements of §1498 and that Shaw is not protected from liability for its infringing conduct under that statute.

---

[1]  "The intention and purpose of Congress in the act ... was to stimulate contractors to furnish what was needed for ... war, without fear of becoming liable themselves for infringements to inventors or the owners or assignees of patents.... To accomplish this governmental purpose, Congress exercised the power to take away the right of the owner of the patent to recover from the contractor for infringements." Jetform Corp. v. Unisys Corp., 11 F.Supp.2d 788, 792 (E.D.Va.1998) citing Richmond Screw Anchor Co. v. United States, 275 U.S. 331, 345(1928).

**Discussion**

**Summary Judgment**

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Ford v. Reynolds, 316 F.3d. 351 (2nd Cir. 2003); Fed.R.Civ.P. 56(c). The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant. Ford, 316 F.3d. at 354. "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non moving party.' " Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1535 (2d Cir.1997) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 248, (1986)). While the moving party must demonstrate the absence of any genuine factual dispute, (Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)), the party against whom summary judgment is sought, however, "must do more than simply show that there is some metaphysical doubt as to the material facts... . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87(1986); McCarthy v. American Intern. Group, Inc., 283 F.3d 121 (2d Cir. 2002); Marvel Characters v. Simon, 310 F.3d 280, 285-86 (2d Cir.2002).

**Section 1498**

Section 1498 provides, in part:

> (a) Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture. ... For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and ***with the authorization or consent*** of the Government, shall be construed as use or manufacture for the United States. (Emphasis added).

Although not required by § 1498 itself, the Government generally consents and authorizes the use of a particular device by inserting an authorization and consent clause into its contracts, according to federal procedures. See Parker Beach Restoration, Inc., v. United States, 58 Fed.Cl. 126, 132 (Fed.Cl. 2003) citing 48 C.F.R. §§ 27.201-1, 52.227-1 (directing contracting officers to insert a standard clause into contracts under specific circumstances). However, where such clauses are used, the language must be narrowly construed to determine the scope of the authorization and consent. Auerbach v. Sverdrup Corp., 829 F.2d 175, 179 (D.C.Cir.1987), *cert. denied,* 485 U.S. 905 (1988); Leesona Corp. v. United States, 220 Ct.Cl. 234, 599 F.2d 958, 968, *cert. denied,* 444 U.S. 991 (1979)(Statutory waivers of governmental immunity, such as are embodied in § 1498(a), must be narrowly construed.)

To take advantage of the immunity offered by §1498, the statute provides that a private contractor has the burden to demonstrate that the infringing conduct was undertaken with the "authorization and consent" of the government. Shaw argues that because the use of phosphoric

acid was identified as the most effective additive, was specified in the USACE-approved Work Plan, and because both the TERC and the PRAC required Shaw to follow the process set out in the Work Plan, Shaw's allegedly offending use of phosphoric acid was necessary for compliance with contracts at issue.

In support of this argument, Shaw submits the Declaration of Jeffrey May, a contract specialist with USACE.  May affirms that both the TERC And the PRAC "require the development of a Work Plan specifying the process that will be used, and that "once the Work Plan specifying the soil treatment process is approved, the contractor Shaw must use the process specified in the approved Work Plan." (Docket No. 93 at ¶ 8).  May further states that the phosphoric acid process was included in the Work Plan since April of 2000 and that USACE was made aware of the fact that Sevenson claims that the process infringes Sevenson's patents in August of 2000.  Notwithstanding such knowledge, May states that "USACE has continued to issue approvals of the updates to revisions of the Work Plan specifying the use of this process." (Docket No. 93 at ¶ 10).   Therefore, May concludes, use "of the process specified in the approved Work Plan is therefore necessary as a contractual requirement for Shaw under both the TERC and the PRAC." (Docket No. 93 at ¶ 8).  Sevenson does not appear to dispute Shaw's contention that Shaw would be in breach of its contract with USACE if it departed from the process specified in the Work Plan. (Docket No. 90 at page 8 referring to the deposition testimony of Chris Rice, a Sevenson official).

It does not appear to be disputed that both the TERC and the PRAC require the development of a Work Plan, and require that the Work Plan be approved by USACE.  The TERC, for example, states that the "Contractor is required to submit a [Work Plan]."  The Work

Plan must describe "the Contractor's detailed approach for the performance of the [contract]." (Docket No. 93, Exhibit A, ¶ c.3). The TERC goes on to provide detailed instructions describing the contents of the Work Plan and its development, acceptance by USACE, and execution. (Docket No. 93, Exhibit A, ¶¶ c.3 to 3.4). Among other things, the contract states that "approval of the Work Plan is required prior to the start of field activities. No change in the approved plan shall be implemented without written concurrence of the Contracting Officer." (Docket No. 93, Exhibit A, ¶ 3.3). In light of such language, as a matter of law, compliance with the contract requires that the contractor follow the process specified in the Work Plan.

Sevenson argues that the presence of the A&C clause in the TERC or the PRAC does not, by itself, constitute authorization and consent. Instead, Sevenson asserts that Shaw must demonstrate "explicit or extrinsic evidence sufficient to prove the Government's intention to accept liability for a specific act of infringement." (Docket No. 106 at page 4) Sevenson argues that USACE did not create the Work Plan, but relied upon the contractor (initially IT and later Shaw) to develop the Work Plan. In support of their argument, Sevenson points to the deposition testimony of government agents, such as Bradley Eaton, USACE Project Engineer for the Colonie site project, stating that "the method of stabilization to be used" was selected by the contractor and that the USACE never gave the contractor any specific instructions on what method of stabilization should be used. (Docket No. 106, Exhibit B).

It appears to be undisputed that USACE was not an active participant in the treatability study. Eaton's testimony reflects that USACE relied upon the contractor (then IT) with respect to the process to be used at the Colonie site. However, it is also undisputed that USACE was aware, by October of 2000 at the latest, that Sevenson was claiming that the process included in

7

the Work Plan to be implemented at the Colonie site violated Sevenson's patents. Notwithstanding such knowledge, USACE approved the Work Plan on a variety of occasions as late as April 22, 2003. (Docket No. 93, Exhibit D).  In doing so, USACE was aware that the contractor would necessarily be required to utilize the allegedly offending process specified in the Work Plan to comply with the TERC or the PRAC.  Thus, Shaw's use of the phosphoric acid process  necessarily resulted from compliance with specifications or written provisions forming a part of this contract.

Sevenson relies largely upon <u>Larson v. United States</u>, 26 Cl.Ct. 365, 369-70 (1992) and <u>Carrier Corp. v. United States</u>, 534 F.2d. 244, 247-50 (Cl. Ct. 1976).   Both cases can be factually distinguished from the case at hand.[2]   In <u>Carrier</u>, the government contracted for the removal of refuse from Andrews Air Force Base.  The contract in that case required that the contractor furnish and install certain equipment, including refuse compactors and containers of specified size to be used in the collection and removal of refuse.  In carrying out this contract, the contractor utilized an apparatus for hoisting detachable refuse containers onto a truck for transportation. Carrier alleged that this hoisting apparatus infringed its patents. The Court in <u>Carrier</u> held that the apparatus had "no usefulness at all in relation to the function performed by the government – i.e, the placing of refuse into the compactors and the activation of the devices to compress the refuse into detachable containers." <u>Carrier</u>, 534 F.2d. at 247. Thus, the Court held that the use of the alleged patented apparatus was by the contractor, and not by the

---

[2]  The instant motion for summary judgment places the issues before the Court in a different context than was the case at the time the Court determined the motion for dismiss filed by IT in the precedent litigation.  Not only is the standard of review different, but the record before the Court is more complete now that discovery in this matter has taken place.

government. Further, the Court held that the contractor's use of the apparatus was not with the authorization and consent of the government inasmuch as neither the contract specifications nor any specific instructions from the contracting officer required the contractor to use a particular type of equipment to perform the contract. The Court held that non-infringing equipment could have been used to perform the work required under the contact and absent any specification by the government to use the allegedly infringing equipment, authorization and consent did not exist under §1498. Carrier, 534 F.3d. at 247-249.

In the instant case, the allegedly infringing process was used to perform the primary purpose of the contract – i.e. to treat the contaminated soil at the Colonie site. Further, the allegedly infringing process was specified in the Work Plan approved by the contracting agency, USACE. Thus, a finding that §1498 applies in this case is not contrary to Carrier.

Similarly, in Larson, the plaintiff alleged that doctors providing health care to Medicare and Medicaid patients infringed the plaintiff's patents by using a procedure which utilized thermoplastic splints. The plaintiff had argued that because medical services were paid for by the government, the government was liable for the alleged patent infringement. The Larson case did not involve an A&C clause. Further, the contract between the government and the doctors did not specify any particular procedure to be used in treating the Medicare and Medicaid patients. The Court held that under the circumstances, absent some explicit or extrinsic evidence sufficient to prove the government's intention to accept liability authorization and consent did not exist to make the government liable for the treatment decisions of the doctors under the Medicare and Medicaid program. The Court focused on the fact that the government exercised no control with respect to the choice of the treatment provided under the program.

Larson, 26 Cl. Ct. at 370.

Again, in the instant case, the contracting agency did exercise control in that it approved the Work Plan requiring the use of the allegedly infringing process even after it was aware that Sevenson alleged that the process infringed its patents.

Sevenson argues that because alternative methods existed, the use of the allegedly infringing phosphoric acid process was not "required" to perform under the contracts at issue. Although other treatment methods may have existed, they were not specified in the Work Plan approved by USACE. Indeed, in making the point that other non-infringing processes could be used, Sevenson points to the fact that Shaw and USACE "*agreed* to switch to the use of an acceptable non-infringing process for the Colonie site beginning on November 1, 2004." (Docket No. 106 at page 23).   This only reinforces the fact that the contracting agency, USACE, exercised control over the process used at the Colonie site.

The instant motion by Shaw differs from the motion presented by IT in the prior litigation in that the record includes testimony from USACE that Shaw was required to utilize the process specified in the Work Plan to comply with the TERC and PRAC.[3]  Significant in this regard, in the Court's view, is the testimony from Jeffrey May, the USACE contract specialist, stating that Shaw was *required* to utilized the process specified in the Work Plan to comply with the TERC or the PRAC.  Sevenson has failed to raise a question of fact with respect to this proposition. The testimony of Bradley Eaton, stating that he relied upon the contractor to determine the

---

[3]   Factual questions no longer exist as to whether the phosphoric acid process was "necessarily required" to comply with the contract and whether USACE had knowledge of the alleged infringement when it approved the Work Plan.  These questions were unanswered by the record before the Court with respect to the IT motion. (See Sevenson v. IT et al, 00CV377, Report & Recommendation dated September 27, 2001, page 10).

appropriate process, that he did not participate in the treatability study or specify the process to be used does not contradict May's testimony. The fact that Eaton did not participate in the study or insist on any particular process does not negate the fact that Shaw was required to utilize the process specified in the Work Plan to comply with its contractual obligations with USACE. The government's contractual requirement that Shaw utilize the allegedly infringing process in spite of the knowledge that Sevenson claimed that the process infringed its patent constitutes authorization and consent under the A&C clause in both the TERC and the PRAC.

      Neither Carrier nor Larson require the contracting government agency to expressly use magic language stating that "it would accept liability" for §1498 to apply. By approving the Work Plan requiring the use of the allegedly infringing process while knowing of Sevenson's claims, USACE exercised sufficient control over the process to be used at the Colonie site and implicitly authorized and consented to the use of the process triggering liability pursuant to the A&C clause. This does not, as Sevenson argues, convert §1498 into an insurance policy. Here, the contracting agency was aware that the contract specified a process to be used by the contractor under the terms of the contract notwithstanding known claims of infringement. The Court notes that USACE did not alter or amend the A&C clause after becoming aware of Sevenson's claims or take any other action to evince an intention that the use of the allegedly infringing process at the Colonie site would not fall within the ambit of the A&C clause. This is not a case where liability is foisted upon the government because a contractor, unbeknownst to the contracting agency, utilizes an infringing process that was not necessarily required under the contract.

**Motion to Dismiss**

In light of the above, the defendant's motion to dismiss based upon alleged discovery abuses should be denied as moot.

## Conclusion

Based upon the above, it is recommended that the defendants' motion for summary judgment should be GRANTED.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within ten(10) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. §636(b)(1), Fed. R. Civ. P. 72(b) and WDNY Local Rule 72(a)(3).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME OR TO REQUEST AN EXTENSION OF SUCH TIME WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT DISTRICT COURT'S ORDER ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed2d 435 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d. Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988).

The District Court on *de novo* review will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate

Judge in the first instance.  See <u>Patterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co.</u>, 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to WDNY Local Rule 72(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72(a)(3) may result in the District Court's refusal to consider the objection.**

So ordered.

s/Hon. Hugh B. Scott<br>United States Magistrate Judge

Buffalo, New York
September 16, 2005